HARPER *v.* HENRY J. KAISER CONSTRUCTION Co.

5-2288                                    344 S. W. 2d 856

Opinion delivered April 3, 1961.

*Shackleford & Shackleford,* for appellant.

*Mahony & Yocum,* for appellee.

PAUL WARD, Associate Justice. George L. Harper at the ·age of 45 died suddenly with a heart attack while working for the Henry J. Kaiser Construction Company (appellee) about 11 o'clock a.m. on March 18, 1958. Mrs. George L. Harper his widow filed a claim under the Arkansas Workmen's Compensation Act to recover compensation for her husband's death. Her claim was disallowed by the referee, the full commission and the Circuit Court. From the judgment of the Circuit Court she prosecutes this appeal for a reversal.

There is very little conflict in the lay tesitmony but there are, as often happens in a case of this kind, sharp differences in the medical testimony.

*Factual Background.* Harper for some time had been engaged in industrial construction, performing the duties of an iron worker. In early 1957 he sustained a heart attack and remained inactive until about the middle of that year. Thereafter he worked in Baton Rouge, Louisiana, El Dorado, Arkansas, and finally at Foreman, Arkansas, where appellee was constructing a large cement plant. Approximately 5 days prior to his death Harper was promoted to the position of foreman in charge of a crew of workers. It was his duty to supervise and direct the work of the men in his crew. It is conceded that he was a very conscientious worker and that he took seriously his job as foreman. On the morning of March 18, 1958, Harper, his stepson, Ronald Harper, and two fellow workers reported for work at the plant at approximately 8 a.m., travelling from Texarkana in a car. It had rained the preceding day and the construction area was wet and somewhat muddy. When they arrived at the construction site, Harper walked approximately 200 yards from the gate entrance to the shack where the employees changed into working clothes; he then left the shack and went approximately 350 yards to a pit where his crew, in co-operation with a crane or dragline, was engaged in lowering into position a metal pipe about 14 feet in diameter and 35 to 40 feet long. Near the middle of the morning Harper walked approximately 350 yards back to the shack to confer with his stepson thereafter returning to the pit. The assigned task was completed at about 11 a.m. when the crane was moved very slowly under its own power about 300 yards to a ball mill. Harper, who walked along with the crane, apparently walked to one side some 30 or 40 feet where he was found lying on the ground. He was dead within a few minutes after he was discovered.

*Lay Testimony.* *W. L. Shoemaker,* a witness for the claimant, after reiterating many of the facts above set forth, in substance stated: I am a structural iron worker and knew Harper; I had been working with him approximately two months before his death; I was with him when he went to work on the 18th, and our job was

to place the large pipe in the underground tunnel; my job was to put the chokers around the pipe in order that the crane could lift it; Harper was watching to see that we did the job right — he was directing and showing us how to put the choker on; Harper tried to do a good job and took his responsibilities as a foreman seriously. The witness further stated that the ground was muddy and it was more difficult to walk than usual. On cross-examination he stated that he did not see Harper perform any manual labor on the morning he died. *Ronald Harper*, the deceased's stepson, in substance stated: We ate breakfast together on the morning of the 18th; Harper ate a good breakfast and was in good spirits — had no complaints; my father had been made a foreman 4 or 5 days previously and he took his responsibilities seriously and was anxious to do a good job; I went to work with him on the morning of the 18th; he was supervising and I just glanced over there and saw him helping a boy put the choker around the steel pipe. *Mrs. Harper* stated that her husband had a heart attack in 1957; that on the weekend prior to his death he was in good spirits but felt a deep sense of responsibility for his work; he had just been a foreman for a few days and was real excited.

*L. C. Jones,* a witness for appellee, in substance stated: I saw Harper down there around the rig, and I saw him from time to time that morning — he was standing around like a foreman will; I didn't pay any attention to what Harper was doing. *Horace Houser,* a witness for appellee, in substance stated: I knew Harper had some heart trouble as he had told me about it; the week before he died it was Harper's job to tie reinforcement rods that go into concrete foundations but he had been made foreman 4 or 5 days before he died; I was operating the crane on this occasion and I saw Mr. Harper there that day, and I also saw him when he was lying on the ground. *C. M. Leverett,* a witness for appellee, in substance stated: I am an iron worker employed by appellee, and I knew Harper; his duties as foreman were to supervise the work of his crew; it was

very muddy and in places it was worse than in others, but a man going from place to place could stay in the tracks where the crane had gone; the entire area was muddy and it did require more effort on my part to walk than if it had been dry.

*Medical Testimony. Dr. E. J. Munn,* a witness for the claimant, in substance stated: I am a general practitioner and was acquainted with Harper. I treated him for a heart condition in March of 1957 — he had angina pectoris and high blood pressure; the reason for death as set forth in the autopsy is arteriosclerotic coronary artery disease with coronary thrombosis, which is a hardening of the arteries, probably high blood pressure and a thrombosis or clot in his coronary artery; there was a complete obstruction which cut off the blood supply; I heard the testimony of the witnesses, particularly about the outward signs of excitement and anxiety displayed by Harper, about the terrain being muddy, about the distances traversed by Harper, and about the placing of the choker around the large pipe; I believe the work and activities performed by Harper on the morning of March 18, 1958, were a contributing factor to the aggravation of the pre-existing heart condition and the resulting injury which caused his death; in my opinion his activities on that morning hastened the coronary thrombosis — the reason being the distance he walked and the softness of the earth; in my opinion Harper went beyond his limits of endurance in view of his condition. On cross-examination he stated: I don't know how thick the mud was but it caused extra effort to a degree; in forming an opinion I would have to know how much strain he was under and how much he lifted — it would depend on how much he exerted himself; being promoted to a foreman probably made him feel the responsibility; the promotion might have had something to do with his heart condition; it is just a natural thing for a man having responsibilities to be alert and make a little extra effort; they don't always have to have any excitement or any exertion or any unusual exercise at all to die from heart failure — he could have died in bed. *Dr. Jack M.*

*Sheppard,* a witness for claimant, in substance stated: I am a physician and surgeon; I have been present in the courtroom and heard the testimony relative to the activities of Harper on the morning he died; I understand that he had a pre-existing heart condition as related by Dr. Munn; considering all of these factors it is my opinion that the activities performed by Harper constituted a contributing factor to the aggravation of the pre-existing heart condition, and that they did accelerate or hasten the coronary thrombosis which resulted in his death; I could not say that it definitely produced the coronary thrombosis but they were a contributing cause; the heart puts out a certain amount of energy at all times, and even taking a deep breath puts a certain amount of exertion on it — people frequently die without any more exertion than that; lifting hands above the head without any strain might have caused it but the more weight he lifted the more important it would have been.

*Dr. Joe B. Wharton, Jr.,* a witness for appellee, in substance states: I am a physician and surgeon in the general practice of medicine; this condition of the clot can form gradually or it can form suddenly, the precipitating causes are there for some time prior to the formation and thrombosis can build up over a period of time; it does not necessarily require exertion or exercise or work for it to build up — one can have a coronary thrombosis without any history of exertion at all and death occurs from that cause in bed or at rest; in reviewing the whole story I don't see how it is logical to assume that what Harper did on the morning of his death on the job could have had anything to do with his death, when he had done more strenuous activity with an already diseased heart for some months prior to that time; I do not feel that strenuous work has anything to do with the coronary thrombosis that caused Harper's death, and I am sure that statistics will show that by far many more white collar workers have coronary thrombosis than do men who perform heavy labor, although we advise them not to do strenuous work; I believe that

Harper could have had it just as logically while sitting at the breakfast table or lying in bed — the majority of cases of heart failure do not occur when a person is straining himself or when he is doing heavy physical work; I can not see how it would be logical for me to assume that in any way the physical activities had anything to do with Harper's disease or death; we know the precipitating cause of coronary thrombosis, is that the blood vessels nearly always harden, but why they harden earlier in some people than they do in others is what we don't know. *Dr. D. E. White,* a witness for appellee, in substance stated: I am considered a general practitioner; I have read the transcript of evidence taken before the Referee for the purpose of determining whether Harper's activities had anything to do with his death, and I do not believe that his work that morning or his activities had anything to do with it; in my opinion it would be absurd for a man to be promoted to a foreman and have that bring on a heart attack; I sometimes recommend exercise treatment for my heart patients after they get over the acute stage; I advise my patients to walk; I do not believe that Harper's activities could have accelerated or hastened the thrombosis — we have many patients that die in bed while they are asleep.

Appellant relies on two principal grounds for a reversal in this case, namely; *One,* the Commission erred as a matter of law, and; *Two,* there is no substantial evidence to support the Commission's findings. We shall now discuss these grounds in the order mentioned.

*One.* The principal contention in this connection is that the Commission and the Referee placed upon the claimant the unwarranted burden of showing *unusual* physical exertion on the part of Harper on the morning he died. If the Commission actually did this then the cause should be reversed just as we reversed the Commission for the same reason in the case of *Clark* v. *Ottenheimer Brothers,* 229 Ark. 383, 314 S. W. 2d 497. However, a careful review of the findings by the Commission and the Referee forces us to the conclusion that

appellant's contention can not be sustained. To sustain her position appellant quotes from the Referee's opinion the following: "It would appear from a medical standpoint herein that the doctors are all in agreement as to the heart attack being related to the work a man was doing. If there were heavy exertion expended by the deceased there might be a causal relation . . ." We find nothing in the above quotation which indicates that the Referee had any misconception of the law in this regard. We think the Referee merely meant that if Harper had been engaged in some kind of strenuous work, whether in the normal course of employment or otherwise, it would have been a circumstance to show causal connection. Any doubt as to what the Referee meant is removed by the next to the last sentence in his opinion where it is stated: "Therefore, this referee feels there is no substantial proof to show that the job deceased was doing was in any way related to the attack he suffered." Regardless of what the Referee may have held or found this appeal is from the full Commission and not the Referee. To further sustain her contention, appellant quotes from the findings of the full Commission the following statement:

"We find that there is no proof to show that there was any *unusual* effort or exertion on the part of the deceased in any of his movements from place to place, or in any other actions, . . . in other words, then there is no evidence to support the contention that any exertion on the part of the deceased caused or contributed to the coronary thrombosis resulting in his death." (Emphasis supplied.)

We think the last clause in the above quotation fully explains the first part of the quotation where the word *unusual* is used, and it is further clarified in the last paragraph of the Commission's opinion where it stated: "We are therefore of the opinion that the conclusion of the Referee that there is no substantial proof to show that the work deceased was engaged in was in any way related to the attack of coronary thrombosis was correct." It is possible that there is still some confusion as

to what part the word *unusual* plays in this kind of case. Although it is well established by our decisions, including the *Ottenheimer* case *supra* and the case of *Bryant Stave & Heading Company* v. *White,* 227 Ark. 147, 296 S. W. 2d 436, that an unusual work load (that is more than the normal work load) is not necessary to establish compensation, yet we have not said that an *unusual* work load or an *unusual* exertion was not a factor that could be considered in determining whether there was an "accident" or a causal connection. We think it is clear then that merely because the Commission took cognizance of the fact that in this case there was no showing of any *unusual* effort or exertion on the part of Harper is no indication that it understood or believed that there could be no allowance of compensation unless there was a showing of some *unusual* effort or exertion. It is significant that in this case appellant made an effort to show that Harper did engage in some *unusual* effort or exertion by introducing testimony about the condition of the ground and about Harper lifting a choker as testified to by his stepson. This demonstrates conclusively that appellant sought to profit by showing *unusual* exertion not normally involved in Harper's duties as a foreman. This she was entitled to do as a circumstance to show causal connection. The Commission had a right to point out the weakness of such showing. Therefore, we cannot say that the Commission erred as a matter of law.

*Two.* We do not agree with appellant's contention that there is no substantial evidence to support the Commission's findings that there was no causal connection between Harper's work and his death as a result of a heart failure. We are keenly aware of the fact that in this case, as in other cases before this court, there is a conflict, at least an apparent conflict, between the medical testimony offered by appellant and other such testimony offered by appellee. As is well established by our decisions, and as is now generally understood by all, the burden is on the claimant to show a causal connection, and also the findings of the Commission, just like a jury verdict, will be sustained if supported by substantial

evidence. Perhaps no one can confidently say exactly what brings on a heart attack, or what causes a person to die from a heart attack at a certain instant, or to say just how much or what kind of physical effort contributes to or hastens a heart attack, but it is incumbent upon someone to make a decision. Under our law and procedure it is the Commission. The Commission and not this court weighs the testimony that is introduced by both sides. It is conceded by the doctors for the appellant and the appellee in this case that persons can die of a heart attack while they are resting, walking or sleeping. If this court is to hold that compensation is payable in every instance where a person dies in the course of his employment it would be to transform the Workmen's Compensation Act into an insurance policy. In the case of *Auto Salvage Co.* v. *Rogers*, 232 Ark. 1013, 342 S. W. 2d 85, we noted the lack of harmony among doctors regarding the cause of heart attacks and also noted a lack of power in this court to abolish or ignore the necessity of showing a causal relation in all such cases notwithstanding the attending difficulties. Here, the Commission found there was no causal relation between the deceased's work and his death, and we find the record as heretofore abstracted, constitutes substantial evidence to support that finding.

It follows from what we have heretofore said that the judgment of the Trial Court must be, and it is hereby, affirmed.

Affirmed.