38872.   TROUP COUNTY v. HENDERSON *et al.*

DECIDED JUNE 26, 1961.

30

*Wyatt & Morgan, Lewis R. Morgan,* for plaintiff in error.
*Richter & Birdsong, A. W. Birdsong, Jr., James E. Weldon,* contra.

BELL, Judge. 1. This is another in a long series of heart attack by exertion cases to come before this court. The question for decision is whether there is sufficient evidence to authorize the findings of fact as established by the board.

The deceased's wife testified that he always complained about his arms hurting, but that he never did go to a doctor; that he

complained of pains in his chest, thinking he had indigestion, and ate peppermint candy all the time.

The supervisor testified that the deceased began work on the morning of his death around 9:30, and cut bushes with a bush blade having a handle similar to an axe; that during the time the deceased had worked he had complained about indigestion "once in a while"; that he would take mints for this condition and hit his chest; that cutting the bushes on the morning in question required swinging the blade a good many times; that the bushes were small; that the bush axe weighed about three pounds; that two or three hours of swinging it would be a "good bit of exercise." On cross-examination this witness testified that the deceased had not complained on the day of his death, but had done so several days earlier; that the deceased was laughing and talking while he was eating, and gave no indication he was feeling bad at all. Upon redirect examination, the witness testified that on the day of his death the deceased was not working at his regular job, which was running the grader.

The death certificate stated the death was caused by "acute coronary occlusion." The first medical witness to testify, Dr. (W), who signed the death certificate, testified that this was his diagnosis; that he only saw the deceased dead in the undertaker's parlor; and that he based his conclusion as to the cause of death "on the history I got from the coroner and the undertaker." The following hypothetical question was answered by Dr. (W): "Q. Doctor, I would like to ask you a hypothetical question. Assuming Rufus Henderson, the deceased, was a negro man fifty-three years of age at the time of his death and who for some time prior to his death complained to his wife Maggie Henderson of indigestion and pain in his chest and for years before his death Rufus had worked as a laborer for Troup County, Georgia, and on October 21, 1959, the day of his death, worked as a laborer and his job on the morning before his death at twelve-thirty was clearing a right of way consisting of bushes which he cut with a bush ax for approximately two and a half hours, now after this exertion Rufus sat down to eat his lunch and after completing his lunch dropped dead, Doctor would the exercise and the exertion that Rufus engaged in on the morn-

ing of October 21, 1959, the day of his death, contribute to, aggravate or precipitate the heart attack which caused his death? A. In my opinion that type of exercise all [or?] work, had this condition existed before he did, it would contribute to it." On cross-examination Dr. (W) testified that it was difficult to answer whether the exertion of the deceased on the morning in question had anything to do with his death, and that he *was not saying that it did but that it could have, and that the deceased probably had a pre-existing heart condition.* He further testified that the lunch of shine bone, candied yams, and a pop drink the deceased had eaten "would have been—had more effect that [sic] the exertion." Dr. (W) had never treated the deceased, and the first time he saw him was at the undertaking establishment after his death. He further testified: "Q. Doctor, wouldn't it be more likely that if a man was—had eaten dinner and had slept for ten or fifteen minutes, you couldn't say that the exertion that he had made prior to the time of his lunch could in any have brought it on? A. In my opinion, no, if he had slept fifteen minutes certainly he had rested well and going to bring it on should have brought it on before then." Furthermore, "Q. Your opinion is that he died of a heart attack? A. That is my opinion."

Dr. (W) also testified that the exercise the deceased had had on the morning in question would have aggravated his heart condition "if he had a heart condition," and that it was problematical whether the deceased died of a heart attack as "there was not a post done"; and that complaints of indigestion and of pain in the arms could indicate more than one thing, "could indicate hypotension, or arthritis, myalgia, influenza, or pettic [sic] ulcer or any of the intestinal conditions."

Dr. (M) testified that it was possible for a person to have a heart condition without any complaints; that it would be possible for a person who complained of indigestion to have a heart condition and not know it; that *the most likely diagnosis when a person who had symptoms of indigestion and pain in his chest for years and who suddenly drops dead would be a cardiac condition.* In answer to the same hypothetical question which was asked of the previous medical witness, *this doctor stated*

*that assuming the deceased had a heart attack the exercise and exertion could have contributed to, aggravated, or precipitated the attack.* On cross-examination, this witness testified he had, to his knowledge, never examined the deceased; that due to the fact that the deceased had been doing exercise all his life either in the chaingang, working in work camps, or construction companies, he would have less tendency to be affected by exercise than a man who sat behind a desk; the meal he had eaten could have aggravated the deceased; that if exercise contributed to the attack, the attack could have come later after he had eaten lunch and slept for fifteen minutes; and that it is all very hypothetical as to what caused the attack. *On redirect examination he said the exercise would be more aggravating, assuming the man had a heart attack, than the eating of the ham bone;* from all these conditions that he knew the deceased could have died from cerebral hemorrhage, cerebral thrombosis, embolism to the cerebral arteries, a heart condition other than a coronary, a heart failure or pulmonary "dema"; it could have been a rupture of the blood vessel of the aorta, which is often found in colored people; that exercise could affect aneurism; that it would have been a respiratory—collapse of the lung, a rupture of the pleura when the lung suddenly collapses. On redirect examination, he stated that violent exercise of three hours would aggravate some of these conditions which were possible causes of the death; the aneurism usually happens after exercise, but he didn't think it would have any influence on a cerebral thrombosis but exercise might do it some good; he did not think it would affect the cerebral hemorrhage—"folks that have strokes are not generally engaged in heavy work when strokes occur." "Q. In your opinion then, the exercise and exertion he engaged in on the morning of October 29 the day of his death, assuming he had a heart attack, is this your opinion it did aggravate this condition that caused his death? A. If what you tell me is true, yes, sir." Following this he testified that no actual determination of the cause of death could be made unless there had been a post mortem or autopsy performed.

A fellow employee, Wilbur Strozier, testified that the de-

ceased's cutting bushes on the day of his death was not his regular job, but that he ran a machine most of the time.

The final medical witness, Dr. (T), in answer to the hypothetical question previously stated and substantially identical, and concluding, "I will ask you whether or not in your opinion an acute coronary occlusion by this worker was caused by the physical work he had been performing his—before eating his lunch and went to sleep? A. I don't believe you can say this exertion caused his occlusion because he had no pain, while he was still working, feeling well at that time, he ate his dinner, I don't see how you can connect the fact that he had an occlusion maybe thirty minutes later could be caused by activity that he had during the morning. The coronary occlusion, because it can happen and frequently does happen at night, at complete rest and rarely does exertion ever precipitate these things, and then it has to be unusual and extreme exertion." Dr. (T) further testified that if exertion had contributed to the attack he would have had pain while he was still active. As to his lunch, he stated some cardiologists do think that a fatty meal may have some effect on precipitating a coronary occlusion at the time, but this is a theory that has not been proved; that there is a difference of opinion between doctors as to whether slight exertion can precipitate a heart attack, and that while the work the deceased had been doing would be an unusual exertion for the doctor, it may not have been for the deceased. This concluded the relevant medical testimony.

(a) The medical evidence in this case as summarized above is in some respects contradictory, inconclusive, and meager. However, under numerous decisions of the appellate courts of this State, if there is *any evidence* to support the findings of fact and the award of the State Board of Workmen's Compensation, the appellate courts will not reverse them.

The medical testimony summarized resembles rather closely that found in *Lumbermen's Mut. Cas. Co. v. Bridges,* 81 Ga. App. 395 (58 SE2d 849), where this court held that the board was authorized to find from the evidence that the employee's death resulted from a diseased heart condition, accentuated by physical exertion a short time before his death. In *Hart-*

*ford Acc. &c. Co. v. Walters,* 87 Ga. App. 117 (73 SE2d 70), it was held that knowledge from human experience, including medical caution against exertion, authorized the finding in that case on the weight of reasonable probabilities that the amount of exertion contributed to the cerebral hemorrhage which caused the deceased's death. In the *Hartford* case where the award of compensation was affirmed, the testimony of the three physicians was even less positive than here.

In this case Dr. (W) testified that it was his opinion that the deceased died of a heart attack, and in answer to the hypothetical question regarding the activities of the deceased and the exertion immediately before death, testified that the type of exercise would contribute to the heart attack. Dr. (M) testified that the most likely diagnosis, where a person has had symptoms of indigestion and pain in his chest for several years and suddenly drops dead, would be a cardiac condition. The testimony of several lay witnesses included evidence that the deceased had complained of such pains from time to time. The deceased's supervisor testified that the deceased's regular job was running a machine rather than swinging a brush axe. Taking Dr. (W)'s testimony that in his opinion the deceased died of a heart attack, together with the evidence of exertion and death immediately following, we cannot say that there is not *any* evidence to support the finding of the State Board of Workmen's Compensation that the deceased had a pre-existing heart disease, and that the exertion immediately prior to his death was sufficient to precipitate a coronary occlusion.

(b) The contention of the defendant that the death certificate was not properly admitted in evidence has merit. However, this merely results in the certificate's not being prima facie evidence as to the facts stated in it. *Aetna Cas. &c. Co. v. Pulliam,* 99 Ga. App. 406 (108 SE2d 823). Ignoring its presence in the record, there was still evidence to support the findings of fact and the award. The presence of the improperly executed death certificate did not harm the defendant. In the *Aetna* case this court affirmed an award supported by the evidence, even though there was there in the evidence an improperly executed death certificate. See also *Bituminous Cas. Corp.*

*v. Elliott,* 70 Ga. App. 325, 329 (28 SE2d 292). Furthermore, that inadmissible evidence was admitted over objection will not alone justify setting aside the findings in a hearing before the board. *Davis v. Menefee,* 34 Ga. App. 813, 814 (2) (131 SE 527).

*Judgment affirmed. Felton, C. J., and Hall, J., concur.*