BELÉN DUMONT WIDOW OF FERNÁNDEZ FUSTER ET AL., Petitioners, *v.* INDUSTRIAL COMMISSION OF PUERTO RICO, ETC., Respondent.

No. 570. Decided May 1, 1962.

Sara Torres Peralta, Luis E. García Benítez, and S. L. Lagarde Garcés for petitioners. Donald R. Dexter and Carmen Ana Archeval for the State Insurance Fund.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

We have held in the past that when death or disability ensues from an extraordinary effort which in any way has aggravated, accelerated, or precipitated a cardiac collapse, the same constitutes a compensable labor accident. *Cordero v. Industrial Commission*, 68 P.R.R. 118 (1948). Thus, in *Rivera v. Industrial Commission; Atiles, etc., Int.*, 79 P.R.R. 365 (1956), we stated that in view of the workman's idiopathic condition—hypertrophy and acute dilatation of the heart—and, among other things, the exertion made by him shortly before his death—washing the ambulance of which he was chauffeur—it was sufficient for the purposes "[of] the unusual exertion which is required for death to constitute a compensable accident." And in *Antongiorgi v. Industrial Commission*, 80 P.R.R. 496 (1958), we affirmed the decision denying compensation for a death due to a heart attack, not only because causal relation between the death and the accident suffered by the workman several days before at work was not established, but also for lack of evidence to the effect that the deceased was making an "unusual exertion." *Cf. París v. Industrial Commission*, 52 P.R.R. 427 (1937); *Montaner v. Industrial Commission*, 54 P.R.R. 113 (1939); *Montaner v. Industrial Commission;* 54 P.R.R. 686

(1939) ; *Montaner, Mgr.* v. *Industrial Commission,* 57 P.R.R. 320 (1940) ; *Vega* v. *Industrial Commission,* 57 P.R.R. 853 (1941) ; *Maldonado* v. *Industrial Commission,* 58 P.R.R. 29 (1941).[1] ■ It should be made clear that a pre-existing disease contracted or produced by causes alien to the employment does not necessarily preclude compensation for disability or death resulting from said disease.

■■ The problem we must actually approach refers to cardiac death ensued while the workman is doing work inherent and common to his employment, that is, when it does not involve the exertion of an extraordinary effort. In *Cordero* v. *Industrial Commission,* 68 P.R.R. 118, 122 (1948), we stated the need that "in order that the accident be compensable it is necessary that the effort be an extraordinary or unusual one." The strictness of this rule was controverted in the concurring opinion delivered by the present Chief Justice, Mr. Negrón Fernández, in *Rivera* v. *Industrial Commission, supra,* upon stating that the more recent decisions tended to accept "the more adequate usual-exertion test" as controlling of the right to compensation. Significantly, we made clear later that the unusual exertion does not depend on a comparison between the task the workman "usually performed" and the strain exerted shortly before his death. *Antongiorgi* v. *Industrial Commission, supra,* at 497 (1958) and *Trigo Hnos.* v. *Industrial Commission,* 80 P.R.R. 503 (1958).

Actually, the problem is notably reduced if we assume that the final decision depends on the meaning given to the word

---

[1] We have consistently held that the aggravation of a workman's idiopathic condition is compensable if causal connection is shown between the accident suffered at work or as a result thereof, and the precipitation of the wind-up of the pre-existing disease. *Acting Mgr. State Ins. Fund* v. *Industrial Commission,* 73 P.R.R. 175 (1952) (tuberculosis); *Atiles, Mgr.* v. *Industrial Commission,* 69 P.R.R. 586 (1949) (bronchial asthma); *Atiles, Mgr.* v. *Industrial Commission,* 66 P.R.R. 744 (1947) (influenza); *Cordero, Mgr.* v. *Industrial Commission,* 62 P.R.R. 621 (1943) (Hodgkin's disease); *cf. Colón* v. *Industrial Commission,* 59 P.R.R. 842 (1942) (cardiac death).

"accident." As pointed out in a recent text on this matter—
H. F. McNIECE, Heart Disease and the Law (Prentice Hall,
1961)—the difference in criterion lies in whether the require-
ment for an "accident" is considered from the point of view
of the cause or of the effect. Traditionally to constitute an
accident all that is required is the occurrence of an unfore-
seen or unexpected event, but some state jurisdictions have
required that the cause of the injury or death be due to an
unusual and extraordinary event.[2] This interpretation has
led to the constant use of the terms "usual exertion" and
"unusual exertion." However, as both positions are carefully
examined it will appear that there seems to be no conflict
in the proposition that physical exertion can accelerate,
aggravate or hasten a pre-existing heart disease. The area
of disagreement is reduced to the degree of exertion required
to constitute a compensable accident. We shall not stop to
elaborate on the principles contemplated by the two opposing
positions—usual exertion v. unusual exertion—because in
fact an examination of the different decisions on the matter
does not help us to frame a rule that may be applied with
invariable certainty, at least, in the majority of the cases.
It will suffice to say that locally the mission of administrative
bodies, in the first instance and of this Court, does not consist
in determining the etiological origin of the disease; rather,
it should be limited to determining the existence of a causal

---

[2] In an excellent article, which we recommend, soon to be published
in the *Revista Jurídica de la Universidad de Puerto Rico* (1962), Professor
LARRY ALAN BEAR, of the Law Faculty of said university, states that this
last requisite is, in effect, tantamount to maintaining that the workman
assumes the ordinary risks inherent to the job, because even though it is
admitted that the damage arose as a consequence of the employment, he
will be denied compensation if the work done was the usual and ordinary
work required of him. He considers this position as a vestige of ancient
principles of Common Law grafted in social legislation, which responds
to different philosophical motivations and which was particularly designed
to ease the strictness of the law—by eliminating the pleas of contributory
negligence, assumption of risk, and damages caused by a fellow workman—
when applied to claims for disability or death suffered at work.

relation between the work done and the final result—disability or death—that is, whether the work contributed to the results, through aggravation, acceleration or precipitation of the disease. 1 LARSON, Workmen's Compensation, § 12.20. In this sense there is no need to differentiate between the degree of exertion, although necessarily there must have been some. The function of adjudication will practically consist in a careful examination of the facts with a view to discovering the causal relation pointed out, for it is very seldom possible to determine, isolatedly from the particular facts of each specific case, what constitutes an unusual or usual exertion.[3] Any previous statement in our opinions to the effect that an unusual exertion is unavoidably required to constitute a compensable case, will be considered expressly overruled.

Dr. Manuel Fernández Fuster died when he was hardly forty-eight years old, after having dedicated most of his professional activity to the public service as Director of the Gynecology and Obstetrics Department of the Hospital of the Government of the Capital and as professor of the School of Medicine of the University of Puerto Rico. In the discharge of his duties a deep devotion and dedication to the tasks he

---

[3] The majority of state jurisdictions acknowledges this rule as controlling of the right to compensation. See, 1 LARSON, Workmen's Compensation, § 38.30; *Ben Hur Coal Co.* v. *Orum*, 366 P.2d 919 (Okla. 1961); *Thomas* v. *Aetna Casualty & Surety Co.*, 135 So.2d 505, 506 (La. 1961); *I.B.S. Manufacturing Co.* v. *Dependents of Cook*, 130 So.2d 557 (Miss. 1961); *Hartford Accident & Indemnity Co.* v. *Gant*, 346 S.W.2d 359, 363 (Texas 1961); *McGeorge Construction Co.* v. *Taylor*, 350 S.W.2d 313 (Ark. 1961); *Harper* v. *Henry J. Kaiser Construction Co.*, 344 S.W.2d 856 (Ark. 1961); *Troup County* v. *Henderson*, 121 S.E.2d 65, 70 (Ga. 1961); *Burkley* v. *Atlantic City*, 172 A.2d 1 (N.J. 1961); *Coleman* v. *Andrew Jergens Co.*, 168 A.2d 265 (N.J. 1961); *Abbott* v. *Bedford Products, etc.*, 221 N.Y.S.2d 840 (1961); *Baum* v. *B. & B. Auto Works*, 222 N.Y.S.2d 559 (1961); *Witten* v. *Sargoy & Stein*, 222 N.Y.S.2d 369 (1961); *Ins. Dept. of Miss.* v. *Dinsmore*, 102 So.2d 691 (Miss. 1958); *Ciuba* v. *Irvington Varnish & Insulator Co.*, 141 A.2d 761 (N.J. 1958); Notes, 19 La. L. Rev. 916 (1959); 13 Rutg. L. Rev. 390 (1958); 37 Tex. L. Rev. 258 (1958); 33 Wash. & Lee L. Rev. 420 (1958).

had undertaken stand out. The last four months of his life form the structure within which this claim is molded—as a labor accident.

 He suffered from arteriosclerosis. The disease became apparent four months prior to his death which occurred on Tuesday, January 21, 1958: he was pale, wan, at times he became livid, he looked tired and changes were evident in the color of his·face. He was extremely tense, worried, fatigued, and "was lacking the brilliance and lucidity that were natural in him." This tenseness was due to the "problems that were being added to his usual tasks," and which mainly originated with the proposed transfer of the School of Medicine of the Hospital for the Government of the Capital to the District Hospital of Bayamón, which implied the end of the work he had begun, and the difficulties he met as director of the Gynecology and Obstetrics Department on account of the lack of facilities, the limitations in the budget appropriations for operating expenses, and the apparent failure of his pet project to establish a blood bank in the hospital. He complained frequently of an excess of work—"I am killing myself"—especially of the meetings of the different committees of which he was a member, which became more frequent, particularly during the time prior to his death. Once he had a severe pain in his chest, extending to his right arm which was diagnosed as angina pectoris and although he was advised to rest, repose, and to decrease the rhythm of his work, he continued to attend to his work in the usual way and to work even more intensely by reason of the afore-mentioned factors.

Generally, the daily work of the deceased began at about eight in the morning and ended at six in the afternoon, with a brief interruption for lunch. Later, during the evening, he attended committee meetings and if he stayed at home, he went to work on the materials for his professorship at the School of Medicine. Rarely did he retire before eleven at

night, even though the evidence reveals that during the time prior to the four months preceding his death he enjoyed more rest and tranquility.

On January 20 he attended a meeting held in order to discuss problems related to the Hospital of the Government of the Capital, which lasted until after eleven in the evening. Before going to the meeting, he arrived at his home close to 7 p.m.; he had a "deathly" look and he told his wife, "I'm going to have to leave the school... I just had an unpleasant experience...", referring to the fact that he had been unable to obtain a raise in salary for his chief assistant notwithstanding the fact that it had been promised to him. He looked "pale and shaky," and at the meeting he was "tense and worried." On his return home he was sleepless, in spite of which he arose at the usual hour and left for work at seven in the morning of that fatidical day, the 21st. At approximately nine o'clock, in his office on the third floor of the hospital, he received Dr. José García García, associate medical professor of gynecology and obstetrics with whom he discussed the problems of the institution, revealing a deep concern and his disappointment at the impossibility of solving the problem of the limitation of personnel. Approximately fifteen minutes later he felt an intense pain in the cardiac region and said that "I have a pain in my chest and right arm which extends to the other arm." He bent over the desk with his head between his hands. It was what was called "the final episode": the catastrophe of the coronary artery. Notwithstanding this attack, he kept working and went downstairs from the third to the first floor to make the ground rounds accompanied by his assistants and the students, going from bed to bed visiting the different patients in order to diagnose each case after examining the symptoms and investigating by means of questions.[4] On one occasion he had

---

[4] It is Dr. García's opinion that these ground rounds require an unusual physical strain. The deceased performed this task ever since he began to render his services at the School of Medicine.

to bend over in order to examine a patient who had a hydatid mole. He was constantly moving about during this round and examined the cases of eleven patients. He could not finish the task. Pale and drawn he went to his office, climbing up to the third floor. He did not return in the afternoon to deliver the lecture he had scheduled. He remained confined in his home where he was visited at about six in the evening by Dr. Ernesto Marchand who found him in a state of shock. He took his electrocardiogram which confirmed the coronary catastrophe he had suffered and a blood test revealed the presence of an infarct. As if foreboding his impending death he confessed, "I have killed myself." And unfortunately it thus happened that same evening.

The Industrial Commission, in a divided opinion, sustained that the death of Dr. Fernández Fuster was not a labor accident, but that it was due to the natural result of his undeniable arteriosclerotic condition. It relied mainly on (a) lack of evidence that unusual exertion had been used; and (b) that even though compensation based on usual exertion were admitted, the evidence revealed that on the day of his death the deceased worked less than usual. As to the first ground, we have already set forth as our doctrine in this jurisdiction that the degree of exertion is not the test to determine compensation, but rather the existence of causal relation between the disability or death and some incident at the work; and as to the second one, the quantitative standard used is wholly unsupported as a measure of compensability; rather, every attendant circumstance should be examined in order to determine whether an accident took place which aggravated, accelerated or hastened the final result for which compensation is claimed.

■ Dr. Marchand certified that the death cause was an "acute coronary occlusion *due to arteriosclerosis and other factors*" without the corroboration of a pathological test. We shall not recite here the context of the authorized expert

opinions given during the hearing before the Industrial Commission. In view of the foregoing findings it clearly appears, in our opinion, that among the "several factors" which at the very least, accelerated and hastened the death of Dr. Manuel Fernández Fuster, we may count the physical strain he underwent on the day of his death after having suffered the attack described as a coronary thrombosis and the emotional tension to which he was submitted during the last four months of his life,[5] which overtaxed his already diseased heart with more activity than it could stand.

The judgment rendered by the Industrial Commission will be reversed and the case remanded with instructions to compensate this death.

---

[5] We are not deciding on this occasion whether the strain or emotional tension alone are sufficient to warrant a determination of compensation since we believe that the evidence justifies a conclusion as to the existence of the physical exertion required to establish the causal relation. Nevertheless, see, *Klimas* v. *Trans Caribbean Airways, Inc.*, 176 N.E.2d 714 (N.Y. 1961); *Ins. Dept. of Mississippi* v. *Dinsmore*, 102 So.2d 691 (Miss. 1958); *cf. Feliciano* v. *Industrial Commission*, 84 P.R.R. 188 (1961). See, also, McNIECE, Heart Disease and the Law (Prentice Hall, 1961), Chapter 6, *Mental Strain as a Cause of Cardiac Injury*, pp. 25–33; NAHUM, *Trauma and Heart Disease*, Med. Trial Tech. Q. 45–56 (Dec. 1961); SIGLER, *Strain as a Cause of Heart Disability and Death*, Med. Trial Tech. Q. 205–218 (1961); SIGLER, *Workmen's Compensation for the Cardiac*, 4 Am. J. of Card. 261–265, 416–418, 557–561 (1959); SIGLER, *The Evaluation of Claims for Workmen's Compensation in Cardiac Disability and Death*, 25 Ind. Med. & Sury. 10–15 (1956); WHITE, *Trauma, Stress and the "Arteriosclerotic" Heart (Coronary Heart Disease)*, Med. Trial Tech. Q. 135, 143 (1956); MORITZ, *Coronary Thrombosis*, Med. Trial Tech. Q. 72–74 (1955); BOAS, *Cardiac Injury Resulting from Effort of Trauma* 104 (1955); MORITZ, *Trauma and Heart Disease*, West Res. L. Rev. 113 (1954); TEXON, *Heart Disease and Industry*, pp. 288–291 and 302–304 (Grune and Straton 1954); SIGLER, *Cardiac Disability and Death Caused by Strain: Problem in Workmen's Compensation*, 154 J.A.M.A. 294–299 (1954); SPRAGUE, *The Effect of Trauma and Strain on the Production and Aggravation of Heart Disease*, 23 Bull. N.Y. Acad. of Med. 631–642 (1947); WILLIUS, *Coronary Thrombosis,* 11 Ind. Med. 513–514 (1942). Notes: 29 U.Cinc.L.Rev. 280 (1960); 11 Syr. L. Rev. 135 (1959–60); 37 Tex. L. Rev. 258 (1958); 27 Ford. L. Rev. 462 (1958).