McGeorge Construction Co. *v.* Taylor.

5-2458                                           350 S. W. 2d 313

Opinion delivered October 23, 1961.

*Riddick Riffel,* for appellant.

*Donald Poe,* for appellee.

Carleton Harris, Chief Justice. This is a workmen's compensation case. Claude Taylor, an employee of McGeorge Construction Company, on June 8, 1958, collapsed while on a company job, and died from a heart attack. His widow, Mrs. Flo Taylor, sought compensation benefits for herself and two minor children. Three hearings were held before two referees, and the last of the referees denied the claim, finding that Mr. Taylor's death was not the result of an accidental injury occur-

ring in the course of his employment. Upon review by the full commission, where additional evidence was also introduced, the order of the referee was reversed, and the commission ordered compensation benefits paid to appellee and her minor daughters, holding that claimants had established by a preponderance of the evidence that there was a causal connection between the exertion of the deceased and his fatal heart attack. On appeal to the Circuit Court, the findings of the commission were affirmed. Appeal to this Court has followed.

Proof on the part of the claimant showed that Taylor and his son, Donald, were employed by McGeorge on a job near Benton. The father and son roomed and ate together while working at this location. The father was employed as a motor patrol operator, and the son as a time keeper. There was testimony on the part of Donald to the effect that his father had worked an unusual number of hours during the week preceding his death, and that the motor patrol operated by his father was in poor condition; the witness stated that the machine was driven, and the blade raised and lowered by the use of levers; that these levers would ''kick back hard'' when strain was put on the blade. The machine was guided by a steering wheel. The motor patrol, used in leveling the road under construction, constantly came in contact with rocks about a foot in diameter, which would likewise forcibly jar the steering wheel, and his father had received a burn on the arm from contact with the wheel. Three witnesses on behalf of the company denied that the machine was defective, though the maintenance mechanic for McGeorge stated that Taylor had made a complaint to him that the blade would not stay in position, and he (the mechanic) fixed it. A discussion of the significance of this testimony is not required, inasmuch as we have held numerous times that it is not necessary that an injury be caused by unusual strain or exertion before it is compensable, but rather, the claim is compensable when the claimant's ordinary work aggravates a pre-existing condition, and thus contributes to the

injury.[1] See *Crossett Chemical Co.* v. *Sedberry,* 232 Ark. 608, 339 S. W. 2d 426, and cases cited therein.

Taylor testified that on Saturday night, June 7th, his father complained of his arms hurting and aching, was very tired, too tired to eat supper, and young Taylor took his father's supper to the latter's room. The next morning they had breakfast together, and separated, Donald going to the ice house to pick up ice, and his father proceeding to the job. The son testified that about 8:30 a.m., he arrived at the job, and found his father sitting on the running board of a pickup truck, with his head in his hands. The father's clothes were dirty and wet from sweat, and his face was pale and dry. Donald took Mr. Taylor to the hospital, where he was examined by Dr. H. B. Thorn, Jr. Thorn advised the elder Taylor to stay in the hospital, but the latter did not desire to do so, but wanted to go to his home in Waldron. Under these circumstances, Dr. Thorn told Donald to be sure his father stayed in bed three days upon arriving home. The two left in a car for Waldron. On the way, near Pencil Bluff, the elder Taylor died. Dr. G. E. Watkins of Mt. Ida, who examined the body, executed the death certificate, stating that Taylor's death was caused by a heart attack.

At the hearing before the referee, a letter from Dr. Thorn was offered in evidence by the claimant, while Dr. Howard A. Dishongh testified on behalf of appellants. The last paragraph of Dr. Thorn's letter states:

"The writer is of the opinion that the coronary occlusion could have been caused by his long hours of work and attending stressful circumstances, though it is impossible to ascertain that his death was a direct result of his work."

---

[1] Though holding that Taylor's death was not an accidental injury arising out of his employment, the referee found: "Claude Taylor had been doing very hard, strenuous work for McGeorge Construction Company. He had worked seventy hours during the week which preceded his death. The highway construction work in which he was employed was being carried on in heat and dust. The deceased was working on the job when he suffered his fatal attack."

4

Dr. Dishongh, who did not know Taylor, testified in response to interrogation by appellants' counsel, that he did not think Taylor's approximately thirty minutes of work on the morning of June 8th had anything to do with his death. "I see no connection with a man's heart attack and his work, the actual happening, because there has to be a disease of the inside of those arteries before anything happens." The further question was asked:

"Now, Dr. Dishongh, if the record reveals further that Mr. Taylor had been operating a motor patrol or a grader doing the same or similar type of work for many years and if the record reveals that for several weeks prior to the onset of his illness, that is, on June 8th, 1958, he had worked for seventy hours a week and if the record reveals that prior to June 8th, 1958, the grader which he was operating was somewhat defective in that the gear would kick out and he would have to hold it in with his hand and things of that type, would those facts, in your opinion, or stated more positively, would you state your opinion as to a causal connection between his terminal illness and death in the work he was doing considering further those facts that I have just outlined?"

The doctor replied:

"I don't think it would have a thing in the world to do with it, Mr. Riffel. We see just as many of those cases that happen in the bed as we do while they are at work."

He further stated, "I don't think the weakening of his physical condition would have anything to do with the heart attack." Apparently, Dr. Dishongh was not convinced that Taylor had actually died of a heart attack, for he stated on cross-examination, "Long hours might have aggravated a pre-existing condition providing you knew there was a pre-existing condition. * * * if you could bring out the fact that he had that condition prior to this attack, I would answer your question, 'yes'." Further: "We have nothing except the history to go on that he died of a heart attack. We are assuming

that it happened. He could have had a stroke just as easily." Subsequently, before the commission, Dr. Dishongh was asked:

"Q. But will you say, Doctor, that if he had this condition before he went to work that morning, that his work that morning would have aggravated his condition?

A. If you could positively diagnose it as having been a heart attack, I would have to say yes."

Following the hearing before the referee, the deposition of Dr. E. Lloyd Wilbur, pathologist, was taken, and filed with the commission. Dr. Wilbur testified that he had read the testimony in the case relative to the circumstances surrounding the occasion when Taylor collapsed on the job near Benton. The doctor stated that, from a study of the testimony, he agreed with the two doctors (Thorn and Watkins) that Taylor suffered a fatal heart attack; that, in his opinion, the onset of the heart ailment was shortly "prior to the time that he was in his room at the motel where he was staying and the time he ate supper on Saturday night." He said that Taylor should not have worked on Sunday morning, and the fact that the latter went out on the job, in his opinion, aggravated the disease and increased the chance of a fatal outcome. Specifically, Dr. Wilbur was of the opinion that Taylor had suffered a coronary occlusion with a myocardial infarction. On cross-examination, the doctor expressed his reasons for feeling that the onset of the coronary occurred on Saturday night.

"Because pain in the arms—one or both of them— either right or left—is frequently the first sign of a coronary occlusion or a myocardial infarction.

Q. From your study of this case, do you find any other symptom of coronary occlusion, any other clinical symptom apparent prior to the time of death, besides pain in his arms?

A. The extreme fatigue.

* * * *

Q. All right, sir. So that—what I am getting at—if I told you right now that I had pain in my arms and was tired and didn't want to work, would you think that I was suffering from an incipient coronary?

A. I would consider it enough to suggest that you get an electrocardiogram.

Q. I understand that. But if I told you that I suffered from bursitis in both shoulders, would that make some difference as to whether I should go and get an electrocardiogram?

A. Not if you also had fatigue at the same time."

Dr. Wilbur further was asked by appellants' counsel:

"One other point, and let's get this on the record, too. Can you state positively, doctor, from a medical viewpoint whether or not there has been any aggravation in any individual case such as the one we have under consideration now, unless you know the extent of the pathology before the exertion or the aggravating factor, or whatever it may be, and the condition of the patient after the aggravating factor?"

The witness replied:

"I think you can, for this reason: That a heart attack such as he had is a disease entity and a disease that is clinically demonstrable has become apparent. He has suffered enough to produce subjective findings in him. Now, I do not say that he did not have coronary artery sclerosis for maybe a year or two before this happened, but the condition had progressed to the point Saturday night, or Saturday afternoon, in which his heart function became impaired."

Further:

"Q. And at that time, irrespective of his activity—is that what you are saying?

A. Yes.

Q. All right, go ahead.

A. And then once his heart function became impaired—and I am referring there to the inability of the heart muscle to maintain adequate circulation—then any time immediately after that—and by immediately, I mean within a few days—that he would put an increased muscular effort into his activity—and by increased muscular effort, I mean even being out of bed—or working— that he would increase the load on his already damaged heart muscle; therefore, increased activity would be more apt to produce death.

\*    \*    \*    \*

A. The probabilities are that the increased activity increased his chance of dying.''

Appellants contend that Dr. Wilbur's opinion was conjectural and speculative; i. e., it is not based upon an adequate factual foundation. We do not agree. Dr. Wilbur, who is admitted by appellants to be a qualified and eminent pathologist, testified that he read all the evidence in the case, and based his opinion thereon. Further, he was specific in giving his reasons for concluding that the heart attack had its onset on Saturday night. It is true that his opinion was in conflict with that of Dr. Dishongh, but, of course, in practically every compensation case, relating to a heart attack, there are conflicting medical views.[2] Appellants assert that the mere fact that Taylor had pain in his arms and was extremely fatigued was not sufficient evidence upon which to form an opinion that a heart attack was commencing. Dr. Wilbur was interrogated very closely on this point, and his testimony was rather forceful and emphatic, as heretofore quoted. Of course, none of the doctors could say positively when the heart attack commenced, and Dr. Dishongh's testimony indicates that he thought there was a possibility Taylor might have died

---

[2] Dr. Dishongh agreed that complaints of fatigue and aching in the arms are among the several symptoms of a coronary infarction, but he stated, "I would never have thought of a heart attack just on those two things alone, because we see it so often where we don't even think about heart attacks." Further, "I believe that if the man had been having a heart attack - - - of course, I am no prophet - - - but I believe he would have sought the advice of some physician."

from some other cause. Appellants point out that Dr. Wilbur did not examine the decedent. We might likewise mention that this statement applies equally to Dr. Dishongh. In *U. S. Fidelity and Guaranty Co.* v. *Dorman,* 232 Ark. 749, 340 S. W. 2d 266, we said:

"Witnesses classed as experts are permitted to give their opinion for the very reason they are considered experts, and their opinions are frequently based, and expressed, purely in answer to a hypothetical question—without ever seeing the patient—as is the case with appellants' expert witnesses in this litigation."

Furthermore, the only two doctors who made a personal examination of Taylor, testified that he had suffered a heart attack, and Dr. Thorn was of the opinion that the coronary occlusion could have been caused by "his long hours of work and attending stressful circumstances."

As has been so often stated, we do not disturb the findings of the commission if there is any substantial evidence to support same. We are of the opinion that the testimony herein set out was sufficient to justify the commission in reaching its conclusions, and the judgment of the Circuit Court upholding the award is hereby affirmed.