Alvin Ray WHITE *v.*
GREGG AGRICULTURAL ENTERPRISES

CA 99-1124 37 S.W.3d 649

Court of Appeals of Arkansas
Divisions I and II
Opinion delivered January 24, 2001

*Frederick S. "Rick" Spencer*, for appellant.

*Ledbetter, Cogbill, Arnold & Harrison, LLP*, by: *E. Diane Graham* and *Rebecca D. Hattabaugh*, for appellee Gregg Agricultural Enterprises.

*Terry Pence*, for appellee Second Injury Fund.

SAM BIRD, Judge. This appeal is before this court for a second time. Appellee Gregg Agricultural Enterprises (hereinafter Gregg Farms) originally appealed a finding by the Commission that the appellant, Alvin Ray White, was entitled to a permanent anatomical rating of 26 percent. In the first appeal, we held that we could not reach the merits of White's argument because the Commission had failed to make sufficient findings of fact in support of its conclusion. We remanded with directions to the Commission to include an explanation of why it disregarded White's previous injury in Texas and its effect on White's current disability. *See Doug Gregg Farms v. Alvin R. White*, CA97-1424 *slip op.*, (Ark. App. May 27, 1998). Following our remand, the administrative law judge rendered findings and reached the same result. The law judge found that White's 13 percent impairment to the body as a whole, in combination with his 14 percent loss of cervical range of motion, resulted in a 26 percent disability to the body as a whole. Gregg again appealed to the full Commission. The Commission then considered at length the medical evidence relating to the Texas injury and concluded that White had not proven that he sustained any new loss of cervical motion, instead of the 14 percent,

and that he had sustained only an additional 2 percent impairment rating (instead of 13 percent). White brings this appeal.

This case had been the subject of two hearings before the administrative law judge. The first hearing involved only the issues of compensability and temporary total disability. At the hearing on those issues, White testified that his first workers' compensation injury, a pinched nerve in his shoulder, occurred in 1978, while he was working as a heavy-duty mechanic in Texas, and that he suffered another compensable injury to his back in November 1988. The 1988 injury led to a fusion surgery at C5-6, C6-7 in 1989. White testified that he settled his claim for workers' compensation for approximately $45,000. On cross-examination, he denied being told by his treating physician for the 1988 injury, Dr. Stockton, that he was precluded from returning to work.

White began working part time for Gregg Farms in October 1991, at first on a part-time basis to see if he could handle the work. In February 1992, he began working full time. He testified that the job included a lot of bending and stooping. He said that prior to working for Gregg Farms, he was not having any trouble with his neck nor was he on any medication. On cross-examination, he testified that he saw a doctor approximately eight months before going to work for Gregg Farms. He also stated that he had attempted to see a doctor for follow up from his surgery, but could not get the paperwork from Texas straightened out in order to do so. He said that he began to experience pain, similar to pain he had experienced from his previous injuries, in December 1992, and he would occasionally wear a neck brace, which had been prescribed for him after his neck injury in 1988. He presented to Dr. Foster in April 1993. He stated that Dr. Foster's office billed his Texas compensation carrier for some of the bills. He said he worked at Gregg Farms until approximately two weeks before he had surgery in June 1993. After his surgery, Dr. Foster assigned White a 13 percent impairment rating. White also testified that Dr. Foster considered it to be a new injury. White testified that his fusion surgery was successful, and he returned to light-duty work for Gregg Farms on December 17, 1993, and worked a little more than one month before he was terminated. He applied for temporary total disability and medical benefits from May 25, 1993 through December 17, 1993. Gregg Farms denied all liability.

Doug Gregg, owner of Doug Gregg Farms, testified that when he hired White in late 1991, he was aware of White's back and neck problems. He said that White began to complain about pain in his back and neck shortly after he began working full-time, and that White attributed the pain to a previous injury. He also stated that he remembered White wearing a neck brace shortly after he began working full time, in the spring of 1993. Gregg testified that at no time did White ever report that he had sustained a work-related injury. The first time Gregg realized that White was claiming workers' compensation benefits was when he received a letter from White's attorney. In that letter, White's attorney wrote: "At the time of the injury, Alvin Ray White was working on a truck on a creeper straining with a bar and injured his back. Copy of the letter from the orthopedic surgeon confirming a compensable injury is attached." The description of the injury matched the injury White received in Texas.

Gregg also testified that after he terminated White for leaving the job without notifying him or their immediate supervisor, White mentioned that he had fallen on the job and that he needed to fill out a workers' compensation form in order to report the injury. Gregg argued that White was not entitled to such benefits because White's injury was a recurrence of a previous injury for which he was compensated under Texas workers' compensation law.

On March 25, 1994, the law judge issued an opinion in that case awarding White temporary total disability from May 25 until December 17, 1993, medical benefits, and attorney's fees.

The law judge wrote:

> Claimant testified that he was virtually asymptomatic when he went to work for Gregg and that his disabling condition came on gradually over time. I conclude that this is not a case where claimant remained symptomatic for a period of time following his first surgery and then sustained a recurrence of the initial injury. Dr. Foster's testimony that claimant's permanent impairment has increased by 13 percent is also evidence that claimant sustained a new injury or aggravation causing distinct, new, anatomical deficits rather than a simple recurrence of a previous condition.

Gregg appealed to the full Commission, and White cross-appealed. The Commission affirmed and adopted the law judge's opinion, and this order was not further appealed by either party.

In a subsequent hearing, White sought compensation for permanent disability. At that hearing, the specific issue was whether White was entitled to a permanent anatomical impairment rating, which is the issue of this appeal. Gregg denied liability for any of White's anatomical impairment, arguing that "all anatomical impairment is a result of White's preexisting or prior injury that occurred in 1988."

At that hearing, White testified again to when he began working for Gregg Farms and when his aggravation started. He also testified to the complications experienced after his June 10, 1993, surgery, which included having trouble turning his neck and sitting for a long period of time. He stated that he has continual pain. He stated that despite his problems, he returned to work in June 1994 and is working full time at Micro Plastics in Flippin. On cross-examination, White denied informing one of his doctors that he had been in constant pain since his injury in 1988. White also denied seeing any medical reports that classified him as totally and permanently disabled as a result of the Texas injury.

Dr. Robert Foster testified in a deposition that he first saw White in April 1993. He said White presented to him, complaining of persistent neck pain, headaches, and occasional pain in his arms. Dr. Foster's x-rays of White revealed pseudoarthrosis at C5-6. Dr. Foster attributed the fusion failure at C5-6 to White's smoking and the fact that White underwent two-level fusion surgery, as opposed to a one level.

When asked if the job at Gregg Farms caused White's pseudoarthrosis, Foster replied "No." However, Foster also stated that if he had been White's treating physician in Texas, he would have told White "that if you engage in any type of heavy work or activity, it may become symptomatic enough that you require surgery." He also rated him with a 13 percent impairment rating representing his previous surgeries as well as his previous fusions. He stated that he would not have been able to give him an impairment rating after his surgery in Texas because, at that time, White was not medically maximized in that he did not completely fuse.

He stated that the job at Gregg Farms made White symptomatic in that it caused him more pain, "[h]e had already stated that he had pain." On May 27, 1996, Dr. Foster then included an additional 14 percent rating for loss of range of motion, making a combined anatomical rating of 26 percent.

The administrative law judge issued an opinion stating that White had proven by a preponderance of the evidence that he was entitled to a 26 percent permanent impairment rating as assigned by Dr. Foster. In addition, the law judge found that White had sustained a gradual onset injury while working for Gregg Farms.

Gregg Farms appealed to the full Commission, which affirmed and adopted the findings and the opinion of the law judge. Gregg Farms then appealed to this court, at which time this court remanded the case to the Commission, who in turn remanded it to the administrative law judge to make further findings of fact.

As stated above, upon remand, the administrative law judge again found that White had proven by a preponderance of the evidence that he was entitled to the 26 percent permanent impairment rating as assigned by Dr. Foster. The administrative law judge failed to make findings of fact regarding Dr. Stockton's opinion that appellee was permanently and totally disabled due to the failure of the fusion at C5-6.

The Commission reversed the law judge. It agreed that White has experienced a gradual onset injury that resulted in disability in May 1993. It cited the medical records resulting from his Texas injury that stated that White could neither get and keep employment nor engage in any substantial gainful activity. It found that White had sustained a compensable aggravation of his preexisting injury, causing him to undergo a second fusion at the C5-6 level.

In addition, the Commission repeated that Dr. Foster had stated "unequivocally" in his deposition that the 13 percent anatomical impairment rating included everything that had been done to White, including the previous fusion surgery in 1989 as well as the re-fusion performed in 1993. It noted that the record reflected that the 13 percent anatomical impairment rating assigned by Dr. Foster was based upon and took into consideration White's preexisting condition. Furthermore, as explained by Dr. Foster, 11 percent of the 13 percent was attributed to the original two-level

fusion surgery made necessary by the Texas injury. Therefore, Dr. Foster only assigned, and the AMA Guidelines only allowed, an additional 2 percent impairment rating for the second surgical procedure to repeat the fusion that was required as a result of the compensable aggravation.

In addition, the Commission found that White had not proven by a preponderance of the evidence that he was entitled to a 14 percent permanent impairment rating for loss of range of motion. It found that although the record revealed that White did suffer a loss of range of motion after undergoing his first surgical procedure, there was insufficient evidence to determine the extent of his motion in his cervical spine prior to and subsequent to the 1993 repeated fusion. It did not dispute that White suffered a loss of range of motion, but found that it was unable to determine how much of that loss preexisted his compensable injury. Therefore, the Commission reversed the law judge's award of 26 percent and awarded White a 2 percent impairment rating. White brings this appeal.

### Law of the case

In the first hearing in this case, determining whether White had sustained a compensable injury in the course and scope of his employment, the administrative law judge made a factual finding that White had not remained symptomatic for a period of time following his first surgery and then sustained a recurrence of the initial injury. For his first point on appeal, White argues that that finding became the law of the case because it was affirmed and adopted and not appealed to this court. He argues that if the Commission is allowed to reverse itself after a final order — that being the order determining whether White was entitled to temporary total disability — it would give a party "two bites at the apple instead of just one." We do not agree with this argument.

The issue of permanent impairment rating was never before the law judge at the first hearing. The only issue presented by White at that hearing concerned the issue of temporary total disability. In fact, White's counsel stated to the law judge at the first hearing the issue being considered was that of temporary total disability and that the parties were not arguing the issue of permanent impairment rating.

Before the hearing on the issue of temporary total disability the following exchange took place:

> LAW JUDGE: ... Now, are we trying the permanent impairment or —

> MR. SPENCER (*attorney for White*): No, Your Honor. Diane (counsel for Gregg) and I talked yesterday, and I wanted to add that as an issue, but Diane has some other things she had to do before that becomes an issue. This will probably clearly be Second Fund case since he did have a previous workers' comp. injury.

> LAW JUDGE: Okay.

> MR. SPENCER: However, you know, we are able to introduce by agreement the reports that were just received from Doctor Foster which indicates another 13 percent in addition to what he already had.

 *Res judicata* applies where there has been a final adjudication on the merits of the issue by a court of competent jurisdiction on all matters litigated and those matters necessarily within the issue that might have been litigated. *Castleberry v. Elite Lamp Company*, 69 Ark. App. 359, 13 S.W.3d 211 (2000). The doctrine of *res judicata* is applicable to decisions by the Commission. *Castleberry v. Elite Lamp Company, supra.* The doctrine of res judicata applies only to final orders or adjudications. *White v. Air Systems, Inc.*, 33 Ark. App. 56, 800 S.W.2d 726 (1990). The filing of a petition for review with the full Commission within thirty days prevents the order of the administrative law judge from becoming final. *White v. Air Systems, supra.* The key question regarding the application of *res judicata* is whether the party against whom the earlier decision is being asserted had a full and fair opportunity to litigate the issue in question. *Castleberry v. Elite Lamp Company, supra.*

 Whatever is before the supreme court and disposed of in the exercise of its jurisdiction must be considered settled, and the lower court must carry that judgment into execution according to its mandate. *Bussell v. Georgia Pacific Corp.*, 64 Ark. App. 194, 981 S.W.2d 98 (1998). The trial court, and by analogy the Commission, has no power to change or extend the mandate of the appellate court. *Bussell v. Georgia, supra.* In *Bussell v. Georgia*, we stated:

> Whatever was before the Court, and is disposed of, is considered as finally settled. The inferior court is bound by the judgment

or decree as the law of the case, and must carry it into execution according to the mandate. The inferior court cannot vary it, or judicially examine it for any other purpose than execution. It can give no other or further relief as to any matter decided by the Supreme Court even where there is error apparent; or in any manner intermeddle with it further than to execute the mandate and settle such matters as have been remanded, not adjudicated by the Supreme Court. ... The principles above stated are, we think, conclusively established by the authority of adjudged cases. And any further departure from them would inevitably mar the harmony of the whole judiciary system, bring its parts into conflict, and produce therein disorganization, disorder, and incalculable mischief and confusion. Besides, any rule allowing the inferior courts to disregard the adjudications of the Supreme Court, or to refuse or omit to carry them into execution would be repugnant to the principles established by the constitution, and therefore void.

64 Ark. App. at 199–200, 981 S.W.2d at 100 (quoting *Fortenberry v. Frazier*, 5 Ark. 200, 202 (1843)).

██ ██ The Commission cannot change its findings of fact on remand. *Lunsford v. Rich Mountain Elec. Coop.*, 38 Ark. App. 188, 832 S.W.2d 291 (1992). Matters decided on prior appeal are the law of the case and govern our actions on the present appeal to the extent that we would be bound by them even if we were now inclined to say that we were wrong in those decisions. *Lunsford v. Rich Mountain Elec. Coop., supra.* The supreme court has long adhered to the rule that when a case has been decided by it and, after remand, returned to it on a second appeal, nothing is before it for adjudication except those proceedings had subsequent to its mandate. *Ouachita Hospital v. Marshall*, 2 Ark. App. 273, 621 S.W.2d 7 (1991).

White seems to argue that the Commission and this court are bound by the findings made by the administrative law judge after the hearing on whether White had suffered a compensable injury. We disagree. What this court is reviewing is whether White is entitled to permanent disability benefits based upon an assigned anatomical impairment rating. That issue was not before the administrative law at the first hearing (and, thus, not before the Commission), and both parties agreed that the issue of any permanent impairment would be taken up at a later hearing. Furthermore, Dr. Foster's deposition testimony in which he discussed how

he arrived at White's 13 percent anatomical impairment rating was not even taken until after the first hearing. It was not until after the 13 percent impairment rating was assigned and the deposition taken that Foster assigned an additional 14 percent impairment rating for loss of range of motion.

Further, we are not bound by the Commission's findings in the first appeal to this court on the issue of permanent disability benefits because we instructed the Commission to take into account more testimony, testimony that we thought was relevant to the outcome of the case, that the Commission had not considered in making its original determination. In our remand, we told the Commission to consider White's previous injury, his pain from that injury, and Dr. Stockton's analysis of White's condition. That is exactly what the Commission has done.

In addition, one of the factors to be considered in determining the applicability of the doctrine of *res judicata* is whether the party against whom the earlier decision is being asserted had a full and fair opportunity to litigate the issue in question. *Castleberry v. Elite Lamp Company, supra.* In the case at bar, the Second Injury Fund[1] was not made a party to the case until the second hearing before the administrative law judge involving whether White was entitled to a permanent anatomical rating of 26 percent.

### Substantial evidence

On appellate review, we view the evidence in the light most favorable to the findings of the Commission and give the testimony its strongest probative force in favor of the action of the Commission. *Buford v. Standard Gravel Co.,* 68 Ark. App. 162, 5 S.W.3d 478 (1999). Our standard of review on appeal is whether the Commission's decision is supported by substantial evidence. *Buford v. Standard Gravel Co., supra.* Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Buford v. Standard Gravel Co., supra.* We do not reverse a decision of the Commission unless we are convinced

---

[1] Second Injury Fund was a party to the case before the administrative law judge on the issue of temporary total disability. However, neither party appealed the finding by the law judge absolving the Second Injury Fund of liability, so we do not consider it to be a party on appeal. It did file a brief, but none of the parties argue Second Injury Fund's liability in this case on appeal.

that fair-minded persons with the same facts before them could not have arrived at the conclusion reached. *Buford v. Standard Gravel Co., supra*. In cases where the Commission's denial of relief is based upon the claimant's failure to prove entitlement by a preponderance of the evidence, the substantial-evidence standard of review requires us to affirm the Commission's action if its opinion displays a substantial basis for the denial of relief. *Moser v. Arkansas Lime. Co.*, 40 Ark. App. 108, 842 S.W.2d 456 (1992), *supp. op. on denial of rehearing*, 40 Ark. App. 108, 846 S.W.2d 188 (1993).

Questions concerning the credibility of witnesses and the weight to be given to their testimony are within the exclusive province of the Commission. *Arkansas Dep't of Health v. Williams*, 43 Ark. App. 169, 863 S.W.2d 583 (1993). We defer to the Commission's findings on what testimony it deems to be credible. *Arkansas Dep't of Health v. Williams, supra*. When there are contradictions in the evidence, it is within the Commission's province to reconcile conflicting evidence and to determine the true facts. *Arkansas Dep't of Health v. Williams, supra*. The Commission is not required to believe the testimony of the claimant or any other witness, but may accept and translate into findings of fact only those portions of the testimony that it deems worthy of belief. *Jordan v. Tyson Foods, Inc.*, 51 Ark. App. 100, 911 S.W.2d 593 (1995).

It is undisputed that White suffered a compensable injury in 1988 in Texas and that he underwent a two-level fusion at C5-6 and C6-7. It is also undisputed that the fusion at C5-6 did not succeed. In addition, there was testimony that Dr. Stockton, the treating physician in Texas, found that White was permanently and totally disabled. White went to work for Doug Gregg Farms in October 1991, and in December 1992, began experiencing pain. Both the Commission and the law judge relied upon Dr. Foster's testimony that White suffered from pseudoarthrosis.

The Commission correctly noted that in his deposition testimony, Dr. Foster unequivocally explained that the 13 percent anatomical impairment rating included everything that had been done to the claimant, including his previous two-level fusion surgery in 1989 and the repeated fusion in 1993. In a letter to White's attorney, Dr. Foster stated that based upon AMA Guidelines, White's impairment rating was 13 percent to his cervical spine as a whole. Dr. Foster wrote, "This is based on an anatomical impair-

ment rating since the patient has had three spinal surgeries for this level." As mentioned previously, 11 percent of the 13 percent was based upon and took into consideration White's preexisting condition, and, therefore, the Commission determined that only 2 percent was attributable to White's 1993 surgery, which was required as a result of the compensable aggravation he sustained from working at Doug Gregg Farms.

Even though Dr. Foster assigned White a 14 percent impairment rating to the cervical spine, he was unable to apportion this loss of range of motion to White's 1989 two-level fusion surgery or the re-fusion surgery in 1993, or a combination of both. In fact, in his deposition testimony, he admitted that he never tested White in order to assign him a 14 percent impairment rating. The Commission found that White had suffered a loss of range of motion, but it simply said that White had not proven that the entire 14 percent was due to the aggravation he sustained from working at Doug Gregg Farms or the surgery in 1993 that the aggravation precipitated. It found that:

> Dr. Foster merely arrived at the 14 percent functional impairment rating for loss of range of motion by comparing claimant's post-surgical motion with that of a normal person. .... Therefore, it is mere speculation that the entire 14 percent resulted from claimant's compensable injury. Without medical evidence establishing a baseline range of motion after claimant's first surgical procedure, we cannot determine the extent, if any, of claimant's loss of range of motion as a result of his compensable injury.

Based upon the foregoing, we affirm.

STROUD, C.J., ROBBINS, and NEAL, JJ., agree.

ROAF, J., concurs.

GRIFFEN, J., dissents.

ANDREE LAYTON ROAF, Judge, concurring. I agree with the majority that this case should be affirmed on all points. With regard to the issue on which this court is in disagreement, whether Alvin Ray White is entitled to an award for more than the two percent anatomical rating sustained during his employment with the appellee, it needs to be clearly said that we must affirm on this issue for the simple reason that the case involves

only anatomical impairment. There is no evidence of any wage loss award by the Commission in the record before us, nor even any discussion of wage loss in the Commission's opinion.

As pointed out by the majority, all of the 26 percent disability awarded to White by the Commission in its first opinion was based on an anatomical rating, of which a portion was sustained during White's previous employment in Texas, and a portion sustained during White's employment with the Appellee. After this court reversed, on remand, the Commission found that there was insufficient evidence to support 14 percent of this rating, and that only two percent of the proven 13 percent anatomical impairment was sustained during his employment with appellee Gregg Agricultural Enterprises. I agree that there is substantial evidence to support these findings. Consequently, under these facts, there is no issue of apportionment and no Second Injury Trust Fund liability because the fund is liable only for wage-loss benefits, not anatomical loss. Most importantly, there can be no liability to either Gregg Agricultural Enterprises or the Second Injury Trust Fund for the anatomical loss suffered by White in his previous employment.

In *Weaver v. Tyson Foods,* 31 Ark. App. 147, 790 S.W.2d 442 (1990), this court affirmed a decision in which the Commission found that a preexisting 15 percent anatomical impairment combined with the new 5 percent anatomical impairment rating to result in an additional 30 percent wage loss disability for a total award of 50 percent, and that there was thus Second Injury Trust Fund liability. However, the Commission further found that the second employer was only responsible for the 5 percent anatomical impairment Weaver sustained while under its employ, and that the Second Injury Trust Fund was entitled to a credit for the preexisting 15 percent impairment. On appeal, Weaver objected to the credit allowed to the Second Injury Trust Fund. In affirming the Commission's decision, this court stated:

> When it is determined that through the combination of a preexisting condition and a current compensable injury the claimant has sustained a disability *greater than would have resulted from either of them alone*, the statute provides that the claimant shall be fully compensated for his current disability. But the statute does not provide that the Second Injury Fund shall compensate the claimant for his preexisting condition. There are several obvious reasons for this. If the preexisting condition was the result of a compensable injury,

the claimant has presumably already been fully compensated for it. But if the preexisting condition was from a nonwork-related injury, a congenital defect or disease process, it is not covered by the workers' compensation law and neither the employer nor the Second Injury Fund is liable. To hold otherwise would make workers' compensation general disability insurance.

(Emphasis added.) Moreover, in *Nelson v. Timberline Int'l, Inc.,* 332 Ark. 165, 964 S.W.2d 357 (1998), this court stated that the legislature clearly intended that "any employer who employs a handicapped or disabled worker is responsible only for such actual anatomical impairment as may result from the last injury, and the Second Injury Trust Fund is obligated to provide compensation for any greater disability that may result from a combination of injuries."

Unlike in *Weaver*, this case has no wage-loss component. Clearly, there can be no combination of a preexisting condition and a current compensable injury which results in a disability greater than would have resulted from either of them alone when, as in the instant case, there is *no additional award of wage loss*, and it matters not whether the current injury is characterized as an "aggravation" of a preexisting condition as asserted by the dissent, or a new injury.

This is simple math; the current employer, Gregg Agricultural Enterprises, is liable only for the 2 percent anatomical impairment sustained by White while in its employ, and no one is liable for payment on account of the preexisting 11 percent anatomical loss. It has already been paid for by White's previous employer.

WENDELL L. GRIFFEN, Judge, dissenting. Once again, the Workers' Compensation Commission has improperly employed an Act 796 analysis to a claim that is governed by pre-Act law. Its decision awarding a 2% anatomical impairment in this case results from the same flawed "major cause" analysis that we reversed in *Ellison v. Therma Tru*, 66 Ark. App. 286, 989 S.W.2d 927 (1999). In addition, the Commission failed to follow the law pertaining to aggravation of preexisting conditions as stated in *Bearden Lumber Co. v. Bond*, 7 Ark. App. 65, 644 S.W.2d 321 (1983), and other cases arising under the law that existed in 1992. Furthermore, the Commission either forgot or simply refused to apply the law on apportionment that has governed workers' compensation claims involving successive disabilities and impairments for four decades,

which has long been part of our Second Injury Fund statute, Arkansas Code Annotated § 11-9-525 (Repl. 1996). Because I disagree with the majority decision affirming what I consider to be a plain and recurring error, I must respectfully dissent.

## I. Major-Cause Analysis

Like the worker in *Ellison, supra*, Alvin Ray White had pre-existing conditions that were aggravated by a subsequent compensable injury. The record shows that the preexisting problems with White's cervical spine, although asymptomatic when White's current claim arose, were aggravated by the work-related injury sustained in the last employment with appellee resulting in a combined permanent anatomical impairment of 27% to the body as a whole. As was true in *Ellison, supra*, the Commission's employment of a "major cause" analysis is not explicit in the present case. Nowhere does the Commission use the term "major cause" or otherwise intimate that Act 796 reasoning is employed.

Nonetheless, it is implicit that the Commission used a major cause analysis by its refusal to include White's impairment attributable to his preexisting condition and thereby limiting his benefits to a 2% anatomical impairment, as is shown by the following excerpt from its opinion:

> As explained by the Court of Appeals in its opinion remanding our prior award of 26% impairment we must determine whether the 26% impairment rating assigned by Dr. Foster is causally related to claimant's aggravation of his pre-existing condition while taking into consideration claimant's pre-existing condition. The record reflects that the 13% anatomical impairment rating assigned by Dr. Foster is based upon and takes into consideration claimant's pre-existing condition. As explained by Dr. Foster 11% of the 13% rating is based upon the original two level fusion surgery. The AMA Guides only allow and Dr. Foster only assigned an additional 2% for the second surgical procedure to re-do the fusion which was required as a result of the compensable aggravation. *Accordingly, we cannot find that respondent is responsible for the impairment which directly attributable to claimant's first fusion surgery which took place prior to claimant's compensable injury. Respondent is not liable for claimant's original compensable injury for which he received compensation benefits in Texas as well as a lump sum settlement. Using the AMA Guides, we find that claimant did sustain and has proven entitlement to a 2% anatomical impairment rating to the body as a whole. This impairment is*

*directly related to claimant's compensable injury with respondent for which he underwent a second surgical procedure to refuse the C5-6 level.*

*With regard to the functional impairment rating assigned for claimant's loss of motion, we cannot find that claimant has proven by a preponderance of the evidence entitlement to any permanent impairment due to loss of range of motion based upon the evidence presented. The record reveals that claimant did suffer a loss of range of motion after undergoing his first surgical procedure. This is confirmed not only in the reports from claimant's Texas physicians but also in Dr. Foster's first examination of the claimant noting a loss of range of motion in the cervical spine. While there may have been some motion in the cervical spine due to the first fusion which failed, there is insufficient evidence in the record to determine the extent of claimant's motion in his cervical spine prior to and subsequent to the 1993 re-do fusion which was required as a result of claimant's compensable injury. Dr. Foster candidly admitted in his deposition that there is no way to determine based upon the evidence before him the degree of claimant's decreased range of motion following the 1989 fusion, at the time of the 1992 compensable injury, or at the time Dr. Foster first examined claimant prior to performing the repeat fusion in June of 1993. Although the medical evidence does reveal that claimant presently has a loss of range of motion as a result of the two cervical fusion surgeries combined, we are unable to determine how much of that loss pre-dated claimant's compensable injury. Dr. Foster merely arrived at the 14% functional impairment rating for loss of range of motion by comparing claimant's post-surgical motion with that of a normal person. Clearly, claimant's cervical spine was not normal after his first surgical fusion. Therefore, it is mere speculation that the entire 14% resulted from claimant's compensable injury. Without medical evidence establishing a baseline range of motion after claimant's first surgical procedure, we cannot determine the extent, if any, of claimant's loss of range of motion as a result of his compensable injury. Accordingly, we find that claimant has failed to prove by a preponderance of the evidence to an increase in his physical impairment rating based upon a loss of range of motion. Any finding based on loss of range of motion would be based upon speculation. Conjecture and speculation, even if plausible, cannot take the place of proof.* [Citations omitted, emphasis added.]

Our decision last year in *Ellison, supra,* invalidated similar reasoning. *See* 66 Ark. App. at 291-92, 989 S.W.2d at 930. While *Ellison* involved a dispute over the extent of a worker's loss of capacity to earn wages and this case involves a dispute over the employer's liability for the extent of Alvin White's successive permanent impairments, the rationale we employed in *Ellison* is properly applicable now.

## II. Aggravation

Not only did the Commission erroneously apply a major cause analysis to a pre–Act claim, it also failed to apply the law pertaining to aggravations in effect when White was injured. As in *Ellison*, the Commission in this case recognized that the medical evidence abundantly demonstrated the functional impairment for which Alvin White seeks to be compensated. As in *Ellison*, Arkansas law at the time of White's 1992 injury did not limit permanent disability benefits "for the resultant condition only if the compensable injury is the major cause of the permanent disability or need for treatment" as currently prescribed by Ark. Code Ann. § 11-9-102(5)(F)(ii)(b). Rather, the law in effect when White suffered the compensable injury for which benefits are sought in this case provided that the employer "takes the employee as he finds him" so that employment circumstances that aggravate preexisting conditions are compensable. *See Public Employee Claims Div. v. Tiner*, 37 Ark. App. 23, 822 S.W.2d 2d 400 (1992); *see also, Wade v. Mr. C. Cavenaugh's*, 25 Ark. App. 237, 756 S.W.2d 923 (1988); *Little v. Delta Rice Mill, Inc.*, 11 Ark. App. 114, 667 S.W.2d 373 (1984); *McGeorge Constr. Co. v. Taylor*, 234 Ark. 1, 350 S.W.2d 313 (1961); *McGregor & Pickett v. Arrington*, 206 Ark. 921, 175 S.W.2d 210 (1943).

Dr. Foster issued a report dated February 9, 1994, in which he assigned a 13% permanent anatomical impairment rating because White had undergone three spinal surgeries. Dr. Foster explicitly stated that the 13% impairment assessment *"is based on an anatomical impairment rating since the patient has had three spinal surgeries for this level. This impairment rating stands regardless of any previous impairment rating."* In other words, regardless of previous assessments of White's impairment, Dr. Foster opined that the *AMA Guidelines to Evaluation of Permanent Impairment* prescribed a 13% rating because White had sustained three surgeries to the area of his cervical spine involved in this claim. There is no question that the 1993 surgery performed by Dr. Foster was necessitated by White's injury while employed by the last employer.[1]

---

[1] This is ascertainable despite the less than helpful abstract submitted by appellant, which failed to include the medical records from appellant's Texas workers' compensation injury as well as numerous other medical records that would have shed more light on the issues before us.

Hence, this employer is liable for the consequences flowing from White's injury, including his 13% impairment that he now has suffered due to three surgical insults to the affected area of his cervical spine, as well as his loss of range of motion. This result is compelled by the holding in *Bearden Lumber Co. v. Bond*, 7 Ark. App. 65, 644 S.W.2d 321 (1983), where our court cited Professor Larson's treatise on workers' compensation law as follows:

> In § 95.12 Larson stated the rule applicable to second medical complication cases which are "work-related" as follows:
>
> > *If the second injury takes the form merely of a recurrence of the first, and if the second incident does not contribute even slightly to the causation of the disabling condition, the insurer on the risk at the time of the original injury remains liable. . . . On the other hand, if the second incident contributes independently to the injury, the second insurer is solely liable, even if the injury would have been less severe in the absence of the prior condition, and even if the prior injury contributed to the major part of the final condition. This is consistent with the general principle of the compensability of the aggravation of a preexisting condition.*

*Id.* at 73, 664 S.W.2d at 325 (emphasis added). The Commission's decision in this case is remarkably similar to the one we reversed in *Ellison*. Pursuant to *Bearden Lumber Co., supra*, we should give it the same treatment.

### III. Apportionment

The problem presented by this case really arises from the Commission's unchallenged failure to apportion White's permanent impairment attributable to his last employment and the aggregate impairment attributable to that injury and his workers' compensation injury in Texas. The answer to this problem is based on law that Arkansas courts enunciated thirty-two years before Act 796 was enacted, in *McDaniel v. Hilyard Drilling Co.*, 233 Ark. 142, 343 S.W.2d 416 (1961), and that later made its way into our workers' compensation statute as part of the Second Injury Fund law, found at Arkansas Code Annotated § 11-9-525 (Repl. 1996).[2]

---

[2] The supreme court again applied the apportionment principle announced in *Hilyard* when it decided *Wilson Hargett Const. Co. v. Holmes*, 235 Ark. 698, 361 S.W.2d 634 (1962). Arkansas eventually made the *Hilyard* standard part of our workers' compensation

*McDaniel* involved a workers' compensation claim by a man who suffered a back injury on February 7, 1958, when he fell from a water truck. The only controversy was the amount of permanent partial disability due the worker. The employer argued that the worker was only entitled to 10% permanent partial disability due to the aggravation of the worker's preexisting deformity of his back. Medical evidence established that the worker's permanent partial disability was 20% to the body, with 10% attributable to the preexisting deformity that produced no symptoms before the work injury, and 10% attributable to the work injury. The Arkansas Supreme Court reversed a circuit court's decision that affirmed the Commission's award of 10% permanent partial disability benefits. In its decision, the supreme court addressed the apportionment issue for the first time as follows, quoting Section 59 of Volume 2, *Larson's Workmen's Compensation Law*:

> "Nothing is better established in compensation law than the rule that when industrial injury precipitates disability from a latent prior condition, such as heart disease, cancer, back weakness and the like, the entire disability is compensable, and except in three states having special statutes on aggravation of disease, *no attempt is made to weigh the relative contribution of the accident and the pre-existing condition to the final disability. Apportionment does not apply in such cases, nor in any case in which the prior condition was not a disability in the compensation sense . . . To be apportionable then, an impairment must have been independently producing some degree of disability before the accident, and must be continuing to operate as a source of disability after the accident.*"
>
> We agree with the logic of the general rule relative to apportionment as set forth above from Larson, and inasmuch as this is a case of first impression in Arkansas, we adopt it as our own.
>
> Arkansas is not one of the three states referred to by Dean Larson as "having special statutes on aggravation of disease."

*Id.* at 233 Ark. 147-148, 343 S.W.2d at 419 (emphasis added). Thus, apportionment is only proper where an impairment indepen-

---

statute at Arkansas Statutes Annotated § 81-1313(f)(2)(ii) (Repl. 1960 and Supp. 1969). The supreme court applied the statute to a claim of successive disabilities in *Davis v. Stearns-Rogers Const. Co.*, 248 Ark. 344, 451 S.W.2d 469 (1970).

dently produces some degree of disability before the accident, and continues to operate as a source of disability after the accident.

In *Chicago Mill & Lbr. Co. v. Greer*, 270 Ark. 672, 606 S.W.2d 72 (1980), the supreme court held that the apportionment statute was amended by Act 253 of 1979 to provide that the Second Injury Fund would be liable for any disability above that attributable to the last employer. In *Harrison Furniture et al. v. Chrobak*, 2 Ark. App. 364, 620 S.W.2d 955 (1981), our court reversed and remanded a case to the Commission so that a worker's disability could be apportioned between his employer and the Second Injury Fund for disability resulting from a prior injury where the prior injury consisted of a withered left hand, arm and leg attributable to a congenital condition.[3]

Thus, it is plain that the supreme court had firmly established the law when Alvin White's claim arose that where a worker suffered from a preexisting impairment or disability and sustained a subsequent work-related injury that increased that impairment or disability, the second employer was only responsible for that portion of the disability or impairment created by the second accident. *See International Paper Co. v. Remley*, 256 Ark. 7, 505 S.W.2d 219 (1974). Had the Commission properly applied the apportionment law, it would have held the Second Injury Fund liable for all impairment beyond that attributable to the last injury.

It is undisputed in this case that White's preexisting impairment to his cervical spine independently produced disability before the last injury. Dr. Foster's testimony was uncontradicted that the preexisting impairment continued and was aggravated by the last injury. Hence, the apportionment principle should have governed this case. However, the Second Injury Fund was absolved from liability.

Neither party has appealed the Commission's decision that absolved the Second Injury Fund from liability. Apparently, White chose to challenge the Commission's decision by arguing that it

---

[3] In *Death and Permanent Total Disability Trust Fund v. Whirlpool Corp.*, 39 Ark. App. 62, 837 S.W.2d 293 (1992), Judge James Cooper of our court observed that the apportionment statute was omitted "improperly or erroneously" from the Arkansas Code of 1987 but remained in effect pursuant to Ark. Code Ann. § 1-2-103(b) (1987). It is now part of our law at Arkansas Code Annotated § 11-9-525(b)(1)-(4) (Repl. 1996).

violated the law of the case. I agree with the majority that this challenge is unwarranted because, as the majority opinion correctly observes, the extent of White's permanent impairment was not adjudicated when this claim was previously litigated.

If the Second Injury Fund had not been absolved of its liability, the burden would have been on appellee and the Second Injury Fund, not appellant, to prove what portion of his impairment was due to his second injury. But the Commission's decision absolving the Fund of liability must now mean that the employer is "solely liable" for the *combined effect* of White's preexisting condition and his injury sustained while in its employment, and not merely that portion of his impairment that is due to his second injury. Because the Commission resorted to the "major cause" analysis of Act 796 rather than the proper legal standard prescribed by *Bearden Lumber Co. v. Bond, supra,* when it absolved the Fund from liability, I do not understand why the majority now affirms the Commission's failure to hold the employer "solely liable" for White's combined permanent impairment produced after his preexisting condition was unquestionably aggravated by the subsequent compensable injury.

It is true that Dr. Foster could not apportion White's functional loss of range of motion between his Texas work injuries and the injury sustained in the last employment. But Dr. Foster plainly testified that the last injury aggravated White's preexisting condition. Hence, there is no evidentiary justification for denying White workers' compensation benefits for the combined effect of the successive impairments. Arkansas law governing this claim plainly made the last employer "solely liable" for the full extent of the injury suffered in its employment *even if that injury and its effect would have been less severe had no previous injury and disability occurred. See Bearden Lumber Co. v. Bond, supra.* Moreover, a previous determination of total disability and the fact that he received workers' compensation benefits did not make White less entitled to compensation for combined disabilities or impairments after he later managed to return to work. *See Davis v. Stearn-Rogers Const. Co., supra.*[4]

---

[4] The *Davis* court stated:

> The capacities of a human being cannot be arbitrarily and finally divided and written off by percentages. *The fact that a man has once received compensation as for 50 percent of total disability does not mean that ever after he is in the eyes of compensation law but half a man, so that he can never again receive a compensation*

I would reverse the Commission's 2% permanent partial disability award and remand the case to the Commission with instructions that it enter an award against the employer for 27% permanent anatomical impairment (13% based on Dr. Foster's 1994 report plus the 14% impairment for loss of range of motion), and for such additional proceedings as may be necessary.

*award going beyond the other 50 percent of total.* After having received his prior payments, he may, in future years, be able to resume gainful employment. In the words of the Colorado court, he may have resumed employment as a 'working unit'. If so, there is no reason why a disability which would bring anyone else total permanent disability benefits should yield him only half as much.

*Id.*, 248 Ark. at 347-49, 451 S.W. 2d at 471-72 (emphasis added).